UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL MCGREGOR,

        Plaintiff,                        Civil Action No. 11-15507

    v.                               District Judge Marianne O. Battani
                                          Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [8] AND**
**GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [13]**

Plaintiff Daniel McGregor appeals Defendant Commissioner of Social Security's ("Commissioner") denial of his application for Period of Disability and Disability Insurance Benefits. (*See* Dkt. 1, Compl.; Dkt. 6, Transcript ("Tr.") 16.) Before the Court for a Report and Recommendation (Dkt. 2) are the parties' cross-motions for summary judgment (Dkts. 8, 13). For the reasons set forth below, this Court finds that Plaintiff has not demonstrated that the ALJ reversibly erred in evaluating his credibility. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 8) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 13) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

**I. BACKGROUND**

Mr. McGregor was 41 years old when he alleges he became disabled and 47 years old when he was last insured for disability insurance benefits. (Tr. 22.) He has two years of post-high-school education. (Tr. 160). Prior to his disability onset date, he worked as a fabricator and as a quality assurance technician setting up and running machines. (*See* Tr. 37-38.)

**A. Procedural History**

In January 2003, Plaintiff filed the first of two applications for disability benefits. (Tr. 16.) In pursuing the first application, Plaintiff stipulated to, and was awarded, a closed period of disability of November 1, 2002 through February 28, 2006. (*Id.*; Pl.'s Mot. Summ. J. at 1.) Although the administrative decision from the January 2003 application is not part of the record, it appears that either the ALJ found, or Plaintiff stipulated, that Plaintiff had no severe impairments as of February 28, 2006, and that he was capable of returning to work at that time. (*See* Tr. 16.)

On May 4, 2007, however, Plaintiff filed an application for Disability Insurance Benefits ("DIB") (again asserting that he became unable to work on November 1, 2002). (Tr. 90.) The Commissioner initially denied this second application on February 7, 2008. (Tr. 16.) Plaintiff then requested an administrative hearing, and on March 25, 2010, he appeared with counsel before Administrative Law Judge Richard L. Sasena, who considered his case *de novo*. (Tr. 16-24, 28-56.) In a June 17, 2010 decision, ALJ Sasena found that Plaintiff was not disabled from November 1, 2002 through Plaintiff's date last insured, September 30, 2008. (*See* Tr. 16-24.) ALJ Sasena's decision became the final decision of the Commissioner on October 26, 2011 when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this appeal of the Commissioner's decision on December 16, 2011. (Dkt. 1, Compl.)

**B. Medical Evidence**

*1. Medical Evidence During the Insured Period: November 1, 2002 to September 30, 2008*

McGregor saw Dr. Suresh Tumma, a cardiologist, about three times per year from May 2005 through October 2009. In May 2005, Plaintiff reported to Dr. Tumma that he had another episode of syncope. (Tr. 200.) Dr. Tumma assessed "[r]ecurrent syncope." (*Id.*) He prescribed Florinef, a medication used to control the amount of sodium and fluids in the body. (*Id.*) The next month, Plaintiff reported no further episodes of syncope and Dr. Tumma continued Plaintiff on Florinef. (Tr. 200.)

Plaintiff next saw Dr. Tumma in March 2006. (Tr. 202.) McGregor reported that he had not had any episodes of syncope over the prior six months. (*Id.*) Dr. Tumma continued Plaintiff on Florinef and scheduled a follow-up in six months. (*Id.*)

In August 2006, Dr. Tumma noted, "Over the last six months [Mr. McGregor] has done well and has not had any episodes of angina, shortness of breath, palpitations, dizziness or syncope. He continues to remain on Florinef[;] he tolerates that well[,] and [he] is doing well." (Tr. 209.)

Dr. Tumma's notes from a September 2006 exam were similar. (Tr. 203.) He remarked that "[o]ver the last six months [Mr. McGregor] has done well. He has not had any episodes of syncope." (Tr. 203.) Based on an echocardiogram, Dr. Tumma stated, "the patient does have mildly dilated aortic root but has remained stable over the last . . . year." (*Id.*) Plaintiff was still taking Florinef at the same dosage. (*Id.*)

In April 2007, Dr. Tumma noted, "[o]ver three months ago he had an episode of dizziness but [Mr. McGregor] is doing well otherwise." (Tr. 208.) Dr. Tumma continued Plaintiff on Florinef and ordered an echocardiogram. (*Id.*)

3

Plaintiff next saw Dr. Tumma in October 2007. (Tr. 207.) Dr. Tumma remarked, "Over the last [six] months [Mr. McGregor] has done well. He hasn't had any episodes of angina, shortness of breath, palpitations, and his dizziness has remained stable." (*Id.*) Dr. Tumma noted that the echocardiogram indicated that Plaintiff's dilated aortic root was "stable" and "unchanged." (*Id.*)

In December 2007, Dr. Tumma noted that Plaintiff denied any "syncopal events." (Tr. 158.)

In January 2008, Dr. R. Scott Lazzara examined Plaintiff for Michigan's Disability Determination Service. (Tr. 160-62.) Plaintiff reported that he had a history of neurocardiogenic syncope since 2001. (Tr. 160.) Dr. Lazzara noted, "[Mr. McGregor] states he will average about two syncopal episodes per week, which are totally random and the cause of which remains unknown." (*Id.*) Plaintiff reported the symptoms as "flu-like," with shaking migrating to his arms and then to his knees. (*Id.*) Dr. Lazzara remarked, "[Mr. McGregor] does not know how long he is unconscious but [he] has been told it has been about one to two minutes." (*Id.*) Plaintiff reported episodes where he had fallen into walls or tables. (*Id.*) After a physical exam, Dr. Lazzara concluded, "At this point, his long-term prognosis is guarded but he does not appear to be deteriorating. He will remain at chronic risk for developing trauma because of these episodes. He states that he still drives but he should not be." (Tr. 162.)

In February 2008, Kimberly Booker, a "medical consultant," reviewed Plaintiff's medical file, including Dr. Lazzara's evaluation, and then completed a "Physical Residual Functional Capacity Assessment" form. (Tr. 163-70.) She provided that McGregor could perform the exertional limitations of light work and that Plaintiff had no postural, manipulative, visual, or communicative limitations. (Tr. 164-66.) She indicated, however, that Plaintiff should avoid all exposure to hazards (machinery, heights, etc.). (Tr. 167.) Booker also found that, "[b]ased on the

4

evidence in file[,] claimant's statement is found to be credible. [The medical evidence of record] does support alleged allegation." (Tr. 168.)

Dr. Tumma next examined Plaintiff in June 2008. (Tr. 173.) McGregor denied chest pain, palpitations, focal neurological deficits, and syncope. (*Id.*) Dr. Tumma noted, however, "[Mr. McGregor] has had episodes of dizziness." (*Id.*) Dr. Tumma assessed, "[d]izziness secondary to vasovegal syncope" and continued Plaintiff on Florinef. (*Id.*)

In August 2008, Plaintiff again denied syncope but reported episodes of dizziness. (Tr. 174.) Dr. Tumma provided, "I advised him to continue the Florinef that he is on. He is to increase his fluid intake. He is to take an extra dose of salt. I will re-evaluate him in my office in six months time." (*Id.*)

*2. Medical Evidence After Plaintiff's "Date Last Insured": September 30, 2008*

Plaintiff returned to Dr. Tumma earlier than anticipated. In October 2008, Plaintiff reported an episode of dizziness followed by syncope. (Tr. 175.) Dr. Tumma advised Plaintiff to "start back on Florinef that he was on before" and ordered an echocardiogram and 24-hour heart monitoring "to rule out significant cardiac arrhythmias." (*Id.*) The testing revealed no significant tachyarrhythmias or bradyarrhythmias. (Tr. 172.) The echocardiogram showed that Plaintiff's aortic root was mildly dilated. (*Id.*) Dr. Tumma planned to see Plaintiff back in six months. (*Id.*)

In April 2009, Plaintiff denied any "episodes of syncope" since his prior visit. (Tr. 198.) Dr. Tumma again continued Plaintiff on Florinef and a follow-up for six-months. (*Id.*)

Also in April 2009, Dr. Charles Edmonds completed a file a review and a "Physical Residual Functional Capacity Assessment" form. (Tr. 179-85.) He found that Plaintiff had no exertional limitations. (Tr. 179.) He indicated, however, that Plaintiff could never climb ladders, ropes, or

5

scaffolds, and had to avoid all exposure to hazards. (Tr. 182.)

Plaintiff's last visit with Dr. Tumma that is reflected in the record was in October 2009. (Tr. 197.) Plaintiff reported that he had experienced episodes of syncope and dizziness. Dr. Tumma noted, "These seem to happen primarily when he is not at home, as he tries to fight the episodes of dizziness without lying down." (Tr. 197.)

It appears that in February 2010, Dr. Tumma was asked to complete a "Medical Source Statement of Ability To Do Work-Related Activities" form. (Tr. 191-96.) While indicating that Plaintiff could perform all the listed activities of daily living, Dr. Tumma largely left the form blank. (*See id.*) He noted, "contact [primary-care physician] for assessment." (Tr. 196.)

In May 2010, Dr. Richard Kovar, a neurologist, evaluated Plaintiff. (Tr. 240-42.) Dr. Kovar summarized Plaintiff's medical condition as follows:

> I had the pleasure of seeing . . . Daniel McGregor, a 49 year old male[,] . . . in regard to long-term syncopa1 episodes with recent increase in syncope. . . . [T]his 49 year old male has had syncope for 7-8 years first occurring in May 2002. His episodes have been stereotypic. Ninety percent of the time he states it starts with a feeling of initial lightheadedness with a feeling of right arm vibrating and right leg vibrating and then he loses consciousness. . . . When he was started on Fludrocortisone[,] he states the spells stopped for about 3-4 months, but then they started recurring on the same medication. When the lightheadedness occurs[,] if he lies down for 1-2 hours[,] he can prevent the syncopal episode, but if he passes out he is "shot for the rest of the day." He has had some falling injuries limited to the elbow. He has hit his head, but no fractures. . . . He loses consciousness for about 1-3 minutes and when he recovers he is disoriented and then has fatigue for the rest of the day. It can occur 3-4 days a week. He says he has had well more than 100 syncopal spells. . . . He has no headache when awakening. Currently his frequency of having lightheaded symptoms is a few times a week.

(Tr. 240.) Dr. Kovar noted that EEG findings were consistent with "abnormality in the left temporal region which was brought out by hyperventilation with findings suggestive for seizure potential."

(Tr. 241.) He started Plaintiff on Tegretol, a medication used to control certain types of seizures. (*Id.*)

### C. Testimony at the Hearing Before the ALJ

#### 1. *Plaintiff's Testimony*

Naturally, the focus of McGregor's testimony at the March 25, 2010 hearing before ALJ Sasena was the frequency of his dizziness and/or syncope and the actions he would have to take to prevent, in Plaintiff's words, "blackout." Plaintiff told the ALJ that the episodes would occur in either the sitting or standing position. (Tr. 34-35.) He continued,

> [dizziness is] how it starts and then if I like stay up or on my feet, the next thing that happens is my body feels like a vibration, mainly my elbows. And when that vibration hits my knees, I got maybe, I would say if even 30 seconds. If I don't lay down, I am going down. . . . If I lay down, it is like I can . . . it is like I can function for a while. If I go down, there is no functioning after that.

(Tr. 35.) When the ALJ asked Plaintiff how often he had "spells of dizziness," McGregor responded, "[a]nywhere from two to five times [per] week." (Tr. 39.) When asked how long the dizziness lasted, Plaintiff replied, "[i]t's hard to say, because I [lie] down." (Tr. 39.) Later, Plaintiff's attorney sought clarification on the frequency of Plaintiff's dizziness and how long he needed to lie down:

> Q  Mr. McGregor, I am having a little trouble following a couple of things and maybe you can clear them up for me. You say that you get [these] pre-dizziness indicators physically, right?
> A  Right.
> Q  And, during a regular week, how many of these predizzy episode indicators do you get?
> A  Probably about a dozen.
> Q  All right. And, when you say you have the easiest reaction is to lie down and get horizontal. How long do you remain horizontal?
> A  One to two hours probably.

7

(Tr. 44.)

In terms of physical limitations, Plaintiff testified that he had no trouble sitting, standing, walking, or lifting as long as he had no dizziness. (Tr. 43.) Plaintiff explained that he lived with his nephew who took care of most of the household chores and drove him around. (Tr. 42.) When asked what he did between 6:00 a.m. until 10:00 p.m., Plaintiff responded, "Pretty much, all in all, watch T.V." (Tr. 44.)

In terms of work attempts, Plaintiff testified that after the administrative hearing for his first application for benefits, he attempted bathroom refurnishing work with his ex-brother-in-law. When the ALJ asked why he stopped that job, Plaintiff responded, "he kind of forced me into stopping. So, I was constantly having to go up and lay down in his truck. He was worried about if something would happen inside a customer's house." (Tr. 34.) Plaintiff also testified that the refurnishing job was against Dr. Tumma's orders because Dr. Tumma told Plaintiff not to work. (Tr. 41.)

### 2. *The Vocational Expert's Testimony*

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations intended to approximate Plaintiff's limitations. The ALJ first asked about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who was limited to "light work with occasional climbing, balancing, stooping, kneeling, crouching and crawling," had to avoid using ladders, and avoid exposure to unprotected heights and moving machinery. (Tr. 51.) The VE then testified that such a person would be capable of unskilled work at the light exertion level; examples included visual inspector, small products assembler, and hand-packager, each with at least 12,500 positions in the regional labor market . (*Id.*) The ALJ then added a sit-stand option which reduced the number of

positions: 1,000 visual inspector positions, 2,500 assembler positions, and 2,500 packaging positions. (Tr. 52.) Next, the ALJ asked about a similar hypothetical individual except that the individual was limited to sedentary, rather than light, work. (Tr. 52.) The VE testified that there would be 3,250 bench assembler positions, 3,250 hand packager positions, and 1,500 inspector positions in the regional market that the individual could perform. (*Id.*)

McGregor's counsel also questioned the VE. (Tr. 53-54.) Most relevantly, counsel asked, "taking into account that the witness has stated that he has [dizziness] spells of four to ten times per week, lasting anywhere up to two hours per spell, are there any types of jobs that would accommodate this type of physical requirement?" (Tr. 54.) When the VE sought clarification, Plaintiff's counsel provided that the individual would have to lie down "for a period of up to two hours twice per work week." (*Id.*) The VE testified that such an individual would not be able to engage in full-time employment. (*Id.*)

## II.  THE ADMINISTRATIVE LAW JUDGE'S FINDINGS

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and Supplemental Security Income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Sasena found that Plaintiff had not engaged in substantial gainful activity from Plaintiff's alleged onset date, November 1, 2002, through his date last insured, September 30, 2008. (Tr. 18.) At step two, he found that Plaintiff had the following severe impairments: "history of vasovagal syncope and ascending aortic aneurysm." (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 19.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform

> light work as defined in 20 CFR 404.1567(b) except the claimant

> requires a sit/stand option as needed; he can occasionally crawl, crouch, kneel, stoop, balance, and climb ramps and stairs, but can never climb ladders; the claimant should avoid all work around unprotected heights and moving machinery.

(Tr. 19.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 22.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 22-23.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from November 1, 2002 through the last insured date of September 30, 2008. (Tr. 24.)

### III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is

limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by The Courts" (internal quotation marks omitted)).

## IV. ANALYSIS

Before turning to the merits of Plaintiff's single claim of error, the Court briefly addresses a procedural issue. Plaintiff states that his "impairments are unchanged from the award of benefits that he received for the closed period of benefits." (Dkt. 8, Pl.'s Mot. Summ. J. at 5.) The Commissioner, perhaps out of abundance of caution, interprets this statement as raising a preclusion argument:

> Even if Plaintiff could establish that the facts surrounding his current claim were somewhat equal in severity to the facts concerning his closed period, he cites no authority that requires two ALJs to decide equivalent facts the same way other than *Drummond v.*

12

> *Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), which is not applicable here because the previous ALJ found that Plaintiff had no severe impairments after his closed period of disability ended.

(Dkt. 13, Def.'s Mot. Summ. J. at 9.) In *Drummond*, the Sixth Circuit held that an ALJ deciding a second disability claim involving an unadjudicated disability period is bound, absent a showing of "changed circumstances" (e.g., medical improvement), to adopt the findings that the administration made in adjudicating a preceding disability claim. *See* 126 F.3d at 840-43; *see also* A.R. 98-4(6), 1998 WL 283902 at *3.

Assuming that Plaintiff is raising a preclusion argument, Plaintiff has not explained how preclusion would not also include the prior finding that, as of February 28, 2006, he had "no severe impairments" and was able to work. (*See* Tr. 16.) In fact, such a finding is inherent in a closed period of disability scenario: "In order to find a closed period of disability, the Secretary must find that at some point in the past, the claimant was disabled and that, at some later point in the past, he improved to the point of no longer being disabled." *See Long v. Sec'y of Helath & Human Servs.*, 45 F.3d 430 (table), 1994 WL 718540, at *2 (6th Cir. Dec.27, 1994). Because Plaintiff was deemed to have "no severe impairments" as of February 28, 2006 (Tr. 16) — a legal conclusion made at step two of the five-step disability analysis — any finding made by the administration regarding listing equivalence (step three) or residual functional capacity (between steps three and four) necessarily pertained to the period *preceding* February 28, 2006 and did not reflect Plaintiff's condition as of that date. Thus, to the extent Plaintiff raises a preclusion claim based on findings that supported his previous award of benefits, the Court does not believe that ALJ Sasena was bound by those findings.

Turning to the merits, Plaintiff challenges only the ALJ's credibility determination: "[t]he ALJ erred in determining that the claimant's allegations were inconsistent with the objective medical

evidence." (Pl.'s Mot. Summ. J. at 4.) While the issue is close, the Court finds that Plaintiff has not demonstrated that the ALJ reversibly erred in assessing his credibility.

A court is to accord an "ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). An ALJ, however, must not reject a claimant's "statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2); *see also* S.S.R. 96-7p, 1996 WL 374186. In fact, the regulations provide a non-exhaustive list of other considerations that should inform an ALJ's credibility assessment: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant received for relief of pain or other symptoms; (6) any measures the claimant used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3). Although an ALJ need not explicitly discuss every factor, *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005), an ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." S.S.R. 96-7p, 1996 WL 374186 at *2.

As an initial matter, the Court emphasizes that Plaintiff's last insured date is September 30, 2008. This is important because, to the extent Plaintiff testified to how often he was having episodes of dizziness at the time of his March 2010 hearing, the testimony is not necessarily contrary to the ALJ's determination that Plaintiff was not under a disability prior to the date last insured. For the same reason, Plaintiff's self-reported symptoms to Dr. Kovar in May 2010 do not significantly undermine the ALJ's disability determination. It is true that the symptoms Plaintiff reported to Dr. Kovar are consistent with his testimony before the ALJ: dizziness 3-4 times per week requiring lying down 1-2 hours to avoid syncope. (*See* Tr. 240.) However, Dr. Kovar's evaluation was well after the September 30, 2008 date last insured. Moreover, Dr. Kovar provided that he was examining Plaintiff for "long-term syncopal episodes with recent *increase* in syncope." (*Id.* (emphasis added).) This suggests that Plaintiff's symptoms as reported in 2010 were not necessarily the same as those prior to the date last insured. *See Nagle v. Comm'r of Soc. Sec.*, 191 F.3d 452 (table), 1999 WL 777355, at *1 (6th Cir. 1999) ("Evidence relating to a time outside the insured period is only minimally probative, . . . but may be considered to the extent it illuminates a claimant's health before the expiration of his insured status." (citing *Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir.1988))).

Thus, the question becomes, assuming that Plaintiff testified that he had episodes of dizziness 2-5 times per week requiring 1-2 hours of lying down *prior to September 30, 2008*, whether the ALJ gave sufficient reasons for discounting that testimony.

The ALJ discounted Plaintiff's statements for several reasons. The ALJ noted, "The treatment records do not support the claimant's allegations of two to five syncopal episodes a week." (Tr. 21.) He similarly reasoned, "If the claimant were having the level of functional limitations as

15

alleged, one would expect consistent recorded complaints in the treatment record. . . . The claimant's testimony is not well supported by the objective medical evidence in the record and therefore not entitled to significant weight." (Tr. 21.) The ALJ further discounted Plaintiff's credibility because Plaintiff's "testimony regarding his smoking and alcohol use are inconsistent with statements made [to] Dr. Kovar." (Tr. 21.)

The ALJ's credibility analysis is not paradigmatic. Nor does the Court necessarily agree with it. But neither of these are the appropriate question on judicial review of an administrative decision. The right ones are whether substantial evidence supports the reasons the ALJ gave, and, if so, whether the supported reasons are sufficient to discount Plaintiff's testimony. While close, the Court answers these related questions in the affirmative.

First, none of Dr. Tumma's treatment notes reflect how many dizzy episodes Plaintiff experienced per week, or the duration that Plaintiff would have to lie down if he experienced an episode. Thus, Dr. Tumma's treatment notes do not explicitly corroborate Plaintiff's testimony.

Second, as the ALJ suggested, they arguably undermine it. In the three months preceding Plaintiff's April 2007 exam with Dr. Tumma, Plaintiff had only a single episode of dizziness. (Tr. 208.) Then in, October 2007, Dr. Tumma noted that Plaintiff's dizziness had "remained stable" (Tr. 207) — indicating that, for about eight months preceding October 2007, Plaintiff was not experiencing dizzy episodes on even a weekly basis (let alone 2-5 times per week). Although subsequent records from Dr. Tumma reflect that Plaintiff did report episodes of dizziness, (Tr. 173, 174, 175, 198, 197), it is notable that Dr. Tumma never modified Plaintiff's Florinef prescription nor indicated that Plaintiff's condition had worsened. It was not unreasonable for the ALJ to have inferred that, if the frequency of Plaintiff's dizzy episodes had markedly increased after October

2007 — especially to the extent that Plaintiff was required to lie down for an hour or two each time — Dr. Tumma would have noted these changed symptoms and tried a different course of treatment. Yet, when Plaintiff reported dizziness in August 2008, Dr. Tumma merely provided that Plaintiff should increase his fluids and take extra doses of salt; and he believed that Plaintiff did not need to be seen again for six months. (Tr. 174.) In October 2008, when Plaintiff reported an episode of dizziness followed by syncope, Dr. Tumma ordered diagnostic testing but also noted that Plaintiff was to restart Florinef and that a follow-up exam was not needed for six moths. (Tr. 172.) In all, Dr. Tumma's records arguably support the ALJ's conclusion that "[i]f the claimant were having the level of functional limitations as alleged, one would expect consistent recorded complaints in the treatment record." (Tr. 21.)

Other, albeit less significant, bases exist for affirming the ALJ's credibility analysis. The ALJ noted that Plaintiff testified that Dr. Tumma prohibited work. (Tr. 20; *see also* Tr. 41.) But the ALJ also recognized that Dr. Tumma did not complete the medical source statement that he was given in February 2010 and instead indicated that the form should be filled out by Plaintiff's primary-care physician. (Tr. 22.) Arguably then, the ALJ implicitly discounted Plaintiff's statement about what Dr. Tumma had told him he could do. The ALJ also noted that at his consultative exam with Dr. Kovar in May 2010, Plaintiff reported that he smoked one pack per day and occasionally consumed alcohol. (Tr. 21; *see also* Tr. 240.) Although explanations exist, the ALJ reasonably found this to be in tension with Plaintiff's March 2010 testimony that he had stopped smoking in January 2010 and did not drink alcohol. (Tr. 21; *see also* Tr. 41.)

Plaintiff's reliance on Dr. Lazzara's statement that he should not be driving does not demand a different conclusion. (Pl.'s Mot. Summ. J. at 6.) It is true that Dr. Lazzara's recommendation

17

supports Plaintiff's claim that he suffers from random episodes of dizziness (sometimes followed by syncope). But the issue is not the unpredictable nature of the episodes but how often they occur and what limitations they cause when they occur.

In sum, Plaintiff's testimony is arguably consistent with the record evidence. But given the considerable deference this Court owes an ALJ's credibility assessment, Plaintiff has not adequately demonstrated that the ALJ's contrary inferences were drawn in error. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."); *see also Sims v. Comm'r of Soc. Sec*, 406 F. App'x 977, 981 (6th Cir. 2011) ("[T]he district court correctly noted that the ALJ's credibility assessment could be disturbed only for a compelling reason."). The Court must therefore affirm.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 8) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 13) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections,

but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

                                      s/Laurie J. Michelson
                                      LAURIE J. MICHELSON
                                      UNITED STATES MAGISTRATE JUDGE

Dated: December 10, 2012

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on December 10, 2012.

                                      s/Jane Johnson
                                      Deputy Clerk